**THE ROSEN LAW FIRM, P.A.**
Brent J. LaPointe, Esq., D. Kan # 78539
Phillip Kim (admitted *pro hac vice*)
Michael Cohen (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827

*Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| JOHN VALENTINE and PAUL O'RENICK, individually and on behalf of all others similarly situated, | Case No: 24-cv-02165 |
| Plaintiffs, | COMPLAINT — CLASS ACTION |
| v. | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| COMPASS MINERALS INTERNATIONAL, INC., KEVIN S. CRUTCHFIELD, EDWARD C. DOWLING, JR., LORIN CRENSHAW, JENNY HOOD and JAMES STANDEN, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Lead Plaintiff John Valentine and Named Plaintiff Paul O'Renick (together, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, announcements, public filings, wire and press releases published by

1

and regarding Compass Minerals International, Inc. ("Compass Minerals," "Compass," or the "Company"), interviews with former Compass Minerals employees and others, and information obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of persons or entities that purchased Compass Minerals securities during the period from February 8, 2023 through March 22, 2024, both dates inclusive (the "Class Period").[1]  Plaintiffs seek to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Compass Minerals purports to be "a leading global provider of essential minerals" and, working closely with a company called Fortress North America ("Fortress"), has been trying to enter the market for fire retardant (also known as "long-term fire retardant"[2]) since at least 2020.  Fire retardant is dropped from airplanes to fight forest fires.

3.     Compass Minerals made an initial investment of $5 million in Fortress in 2020, increased its holding to 45% by investing an additional $45 million in November of 2021, and then purchased the remaining 55% of Fortress for $26 million in cash and approximately $28

---

[1]      Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Compass Minerals at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

[2]      According to the United States Fire Service ("USFS"), long-term retardants slow the advance of fire, even after the water originally contained in the retardants has evaporated. Because all of the retardants discussed in this Complaint are long-term retardants, the terms "retardant" and "long-term retardant" are used interchangeably throughout.

million in additional contingent consideration in May of 2023.  On investor conference calls both before and after completing the acquisition of Fortress, Compass repeatedly touted its takeover of Fortress and Compass' introduction of Fortress products into the fire retardant market as a primary growth opportunity for the Company.

4.     The USFS began dropping fire retardant – the bright red or pink plume dropped from aircraft to fight forest fires – in the early 1960s.  For the approximately 60 years before Compass and Fortress teamed up to try to enter the market in 2020, a product known as Phos-Chek was the only type of fire retardant used in the United States.

5.     Phos-Chek was originally developed and commercialized by Monsanto in the early 1960s, and today it is made and marketed by a company called Perimeter Solutions.  The active ingredient in Phos-Chek is ammonium phosphate.

6.     Fortress retardants, on the other hand, are not based on phosphates, but magnesium chloride, the same compound commonly used to salt roads in the winter.  Magnesium chloride is known to be very corrosive to metals, however, so the Company attempted to neutralize this inherent corrosiveness by adding corrosion inhibitors and other additives to the Fortress retardants.

7.     The USFS makes up essentially the entire market for fire retardant, as it buys the vast majority of retardant and maintains a list – the USFS Qualified Product List (QPL) – of the fire retardant products that can be purchased for use on United States federal and state wildlands. If the USFS decides either not to place a retardant product on the QPL or decides not to purchase it to use fighting fires on wildlands in the United States, the retardant is basically worthless.

8.     The USFS started to test Fortress retardants in 2020 and, by 2021, the Fortress retardants had passed the initial laboratory testing and progressed to a field evaluation.

3

9.      During the field evaluation of Fortress retardant in the summer of 2021, however, a serious problem emerged: While the Fortress retardant appeared to function fine on its own, for the most part, when it came into contact with even trace amounts of Phos-Chek, it formed a thick, congealed substance that was highly corrosive and damaging to aircraft.

10.      The USFS documented this "co-mingling problem" in a detailed report (the "Report") in September of 2021.  The executive teams at Fortress and Compass – including Defendants Crutchfield and Standen, and Fortress CEO Burnham – received copies of this Report by email in or before February of 2022.  After this alarming Report, the USFS continued to test the Fortress retardant but was careful to ensure that the Fortress retardant did not co-mingle with Phos-Chek pending further, specialized testing to see whether the Fortress and Phos-Chek retardants could be safely integrated.  With these integration tests still pending, the USFS added Fortress retardants to the QPL in December of 2022, approving them for use, and in May of 2023, amended its existing contract with Fortress to allow it to conduct this further testing, known as the Integrated Operational Field Evaluation (I-OFE), in the summer and fall of 2023.

11.      The ability to safely integrate with Phos-Chek was essential if the Fortress retardant was going to achieve widespread adoption in the fire retardant market.  This is because, like bees pollinating a field, it is common for an airtanker to leave one base and then land at another with a residual amount (or more) of retardant left in its tank, leading to co-mingling in the ordinary course.  Thus, the Fortress retardant could only reach the stage of "open competition" with Phos Chek – meaning that the Forest Service could put out competitive bids for retardant and allow the nation's need for fire retardant to be filled by both Fortress and Phos-Chek retardant on a competitive, free-market basis, as Compass repeatedly told investors was the goal – if the two products could safely co-mingle in the field.

4

12.    During the Class Period, which runs from February 8, 2023, through March 22, 2024, Compass made a series of false and misleading statements concerning the Fortress retardant.  When asked point-blank whether there was any issue when Fortress retardant co-mingles with Phos-Chek, in February 2023, Compass flatly denied it, stressing that it is a "non-issue."  This was false and misleading.

13.    Moreover, throughout the Class Period, Compass's affirmative statements repeatedly gave investors the false impression that the Fortress retardant had already passed all of the USFS's testing necessary to secure future contracts.  In May of 2023, when Fortress and the USFS amended the existing contract to allow for the USFS to conduct the I-OFE during the 2023 summer fire season, Compass repeatedly touted this contractual amendment as a major commercial milestone for the Company but omitted that the contract was part of the USFS's I-OFE testing program beginning in June, the very next month.

14.    In short, Compass misled investors to believe that no further testing of its retardant was necessary.

15.    Even after the USFS's integration testing had begun in June of 2023, Compass continued to falsely convey to investors that the Fortress retardant had already passed all of the USFS's tests.  In fact, Compass even used a photograph from the ongoing I-OFE testing in its investor presentations, in August and November of 2023, omitting the critical caveat that the plane dropping Fortress retardant in the photograph was participating in the USFS's I-OFE testing program – something Compass knew but investors did not – and instead simply touting the drop as a landmark achievement for the Company.  These statements were false and misleading.

16.    Accordingly, the crux of Compass' false and misleading statements during the Class Period was twofold: (1) that co-mingling was a "non-issue;" and (2) that Fortress retardant

had already passed all of the USFS's testing with flying colors, thus paving the way for a lucrative contract with the USFS for the 2024 fire season and beyond.

17.    This was a charade, and Compass knew it.  Compass knew that co-mingling was still very much an issue that was being probed in the I-OFE.  In fact, Compass was working closely with the USFS on the necessary logistics for the I-OFE – as is clear from Compass's own words – and was also holding weekly calls with the USFS to discuss the co-mingling problem, both before and during the I-OFE that began in June of 2023 and lasted throughout the summer 2023 fire season.  Compass withheld this from investors.

18.    Even if Compass did not have an independent duty to disclose the ongoing I-OFE, it rendered many of Compass's affirmative statements denying that co-mingling was an issue and stating that the Fortress retardant had already passed all of the USFS's tests materially false and misleading during the Class Period.

19.    On March 25, 2024, when it was announced that the I-OFE had uncovered significant corrosion in both of the airtankers that had carried Fortress retardant in the integration testing and, as result, the USFS would not be entering into a contract for Fortress retardant, Compass stock plummeted, losing 23% of its value over the next two trading days, damaging investors.

## JURISDICTION AND VENUE

20.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

23.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

24.     Lead Plaintiff John Valentine purchased Compass Minerals securities at artificially inflated prices during the Class Period and has been damaged thereby.  His PSLRA certification was previously filed with this Court and is incorporated here by reference.

25.     Named Plaintiff Paul O'Renick purchased Compass Minerals securities at artificially inflated prices during the Class Period and has been damaged thereby.  His PSLRA certification is attached hereto.

26.     Defendant Compass Minerals describes itself as "a leading global provider of essential minerals," and has a number of business lines ranging from salt to fire retardants. Compass Minerals is incorporated in Delaware and its principal executive offices are located at 9900 West 109th Street, Suite 100, Overland Park, KS 66210.  The Company's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "CMP."

27.     In connection with Compass Minerals' salt business, after a multi-year investigation, the SEC issued an Order making findings and imposing a cease-and-desist order on September 23, 2022.  The SEC also put out a press release, entitled: *SEC Charges Compass Minerals for Misleading Investors about Its Operations at World's Largest Underground Salt*

*Mine*, with the subheading: *Company also Charged for Disclosure Control Failures Involving Mercury Contamination in Brazil*.

28.    In the press release, Associate Director of the SEC's Division of Enforcement stated: "What companies say to investors must be consistent with what they know. Yet Compass repeatedly made public statements that did not jibe with the facts on—or under—the ground at [the] Goderich [mine].  By misleading investors about mining costs in Canada and failing to analyze the potential financial consequences of its environmental contamination in Brazil, Compass fell far short of what the federal securities laws require."  Compass agreed to pay $12 million to settle the SEC's charges.

29.    In addition, the Company is facing a private securities class action for misleading investors in connection with the Goderich mine, which names Defendant Standen, among other defendants.  Defendants' motion to dismiss that case was denied on December 12, 2023.  *See IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*, 706 F. Supp. 3d 1225, 1263 (D. Kan. 2023) (Melgren, C.J.), *motion to certify appeal denied*, 2024 WL 1140947 (D. Kan. Mar. 15, 2024).

30.    Compass Minerals is also in the business of fire retardants.  According to the Company, its "next-generation fire retardants help to slow, stop and prevent wildfires through the use of high-performing and environmentally-friendly products."

31.    Pertinent to this action, Compass Minerals began a series of equity investments in May of 2020 in Fortress, which it has described as "a next-generation fire retardant business dedicated to developing and producing a portfolio of magnesium chloride-based fire retardant products to help combat wildfires."  After making its initial $5 million investment in 2020, Compass Minerals increased its holding of Fortress to 45% in November 2021 by investing an

additional $45 million, and Compass purchased the remaining 55% of Fortress for $26 million in cash and approximately $28 million in contingent consideration in May of 2023.

32.     Defendant Kevin S. Crutchfield ("Crutchfield") served as the Company's Chief Executive Officer ("CEO") and president, and also served on the Company's board of directors, from May 7, 2019 until January 17, 2024.  As CEO, Defendant Crutchfield was directly involved in the day-to-day operations of the Company at the highest levels, was intimately involved with the Fortress fire retardant business, and was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein.

33.     Defendant Edward C. Dowling, Jr. ("Dowling") has served as the Company's CEO since January 18, 2024, and has served on the Company's board of directors since March of 2020. In this capacity, Defendant Dowling was directly involved in the day-to-day operations of the Company at the highest levels, was intimately involved with the Fortress fire retardant business, and was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein.

34.     Defendant Lorin Crenshaw ("Crenshaw") served as the Company's Chief Financial Officer ("CFO") from December 2021 through the end of the Class Period.  Defendant Crenshaw was responsible for all aspects of the Company's financial management, including accounting, reporting, and investor relations.  Defendant Crenshaw was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or approved or ratified these statements in violation of the federal securities laws.

35.     Defendant James Standen ("Standen") served as the Company's CFO from 2017 to December 2021, when he transitioned to the role of Chief Commercial Officer, which he held

until January 16, 2024.  Defendant Standen was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or approved or ratified these statements in violation of the federal securities laws.

36.    Defendant Jenny Hood ("Hood") joined Compass Minerals in September of 2019 as Vice President of Supply Chains.  In August of 2023, Ms. Hood was named head of fire retardants.  In January of 2024, Ms. Hood was appointed Chief Supply Chain Officer, and is responsible for all aspects of Compass Minerals' fire retardant business.  Defendant Hood was directly involved in the day-to-day operations of the Fortress fire retardant business, and was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein.

37.    Defendants Crutchfield, Dowling, Crenshaw, Standen and Hood are collectively referred to herein as the "Individual Defendants."

38.    Compass Minerals is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

39.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

40.    Compass Minerals and the Individual Defendants are collectively referred to herein as "Defendants."

## DETAILED ALLEGATIONS OF MISCONDUCT

## BACKGROUND

**The History of Fire Retardant in the USA**

41.     The USFS has been using fire retardant – the recognizable plume dropped from aircraft – to fight forest fires since the early 1960s.

42.     Until 2020, only one type of retardant was used in the United States: Phos-Chek.

43.     Originally developed, trademarked and brought to market by Monsanto, the active ingredient in Phos-Chek is ammonium phosphate.  When the phosphate-based Phos-Chek is dropped on land threatened by wildfire, the Phos-Chek triggers a chemical reaction that reduces the flammability of vegetation, preventing the outbreak of fires and decreasing burn intensity.

44.     Phos-Chek has evolved somewhat over time – better thickeners were developed to improve drop characteristics, more sophisticated corrosion inhibitors were added, and certain changes were made to improve its environmental profile – and Phos-Chek continues to dominate the fire retardant market today.

45.     Phos-Chek was spun off by Monsanto in the late 1990s, and is now made and marketed by a company called Perimeter Solutions.

**The USFS *Is* the Market for Fire Retardant**

46.     The USFS *is* the market for fire retardant.  The USFS buys the vast majority of fire retardant and maintains a list – the USFS Qualified Product List (QPL) – of the fire retardant products that are approved to be bought and used on United States federal and state wildlands.

47.     If the USFS decides not to place a retardant product on the QPL or decides not to purchase it for fighting fires on wildlands in the United States, the retardant has essentially no commercial value and is effectively dead in the water.

48.     Gaining a place on the USFS's QPL is generally a two-step process.  First, the retardant must pass a laboratory evaluation.  If it does, then the retardant is conditionally qualified, and it must then undergo a field evaluation.  If the retardant passes the field evaluation, then the product is fully qualified and the USFS has the option to purchase it for use fighting wildfires.

**Fortress and Compass Enter the Scene**

49.     Founded in 2016, Fortress sought to disrupt Phos-Chek's decades-long dominance of the industry by developing a retardant that is not based on phosphates, but on magnesium chloride.  Magnesium chloride is the same compound commonly used to salt roads in the winter.

50.     While magnesium chloride is known to be highly corrosive to metals, the goal for Fortress retardants was to add corrosion inhibitors and other materials to the products in an attempt to eliminate the products' corrosiveness.

51.     If a retardant is corrosive to metals, the retardant will cause damage to the aircraft used to carry and drop the retardant, as well as related safety concerns for firefighting personnel.

52.     Fortress has been working closely with Compass Minerals on its magnesium chloride-based retardants since May 2020.  Fortress makes its retardant using magnesium chloride harvested from Compass's solar evaporation site on the Great Salt Lake near Ogden, Utah.

53.     After making an initial $5 million investment in 2020, Compass Minerals increased its holding of Fortress to 45% in November 2021 by investing an additional $45 million, and Compass proceeded to purchase the remaining 55% of Fortress for $26 million in cash and approximately $28 million in contingent consideration in May of 2023.[3]  Fortress was a material part of Compass Minerals' business since at least late 2021, and remained so throughout the Class

---

[3]     Compass later issued a Non Reliance on Previously Issued Financial Report Form 8 K because the Company identified misstatements related to the contingent consideration liability of up to $28 million, and said the Company would restate the effected financial statements.

Period.  Fortress' importance to Compass is underscored by the fact that Compass' top leadership closely monitored it and touted its prospects repeatedly on earnings calls during the Class Period.

54.     With the financial and operational backing of Compass, Fortress continued its efforts to create a magnesium chloride-based retardant that would be effective on fires without corroding the aircraft from which it is dropped.

55.     Fortress's magnesium chloride-based retardant came in both a powder (dry concentrate) form, known as FR-100, and a liquid (wet concentrate) form, FR-200.  Both FR-100 and FR-200 were designed to be dropped from aircraft.

56.     By May of 2021, Fortress' magnesium chloride-based fire retardant, both FR-100 and FR-200, became the first non-phosphate retardant to be conditionally qualified on the QPL, meaning that the Fortress retardant had passed the USFS's lab testing.

57.     The next test for Fortress retardant was the Operational Field Evaluation ("OFE"), during which 200,000 gallons of FR-100 were dropped from aircraft based at the Missoula, Montana airtanker base in the summer of 2021.

58.     The OFE was designed to test whether the Fortress retardant is an acceptable tool under actual firefighting conditions, as well as to identify any problems that would not be detected during laboratory testing.

**The USFS's Report Documents Severe Corrosion when FR-100 and Phos-Chek Mix**

59.     The OFE revealed a serious problem with Fortress's retardant.

60.     In September 2021, the USFS documented severe, safety-related concerns that had arisen during the OFE that summer in the Report entitled, *Fortress FR-100 Retardant: Documentation of Aviation Safety-Related Concerns when co-mingled with Phos-Chek LC-95*.

61.     As its title suggests, the Report documented severe corrosion when Fortress FR-100 and Phos-Chek co-mingle.  The Report begins by stating: "A serious concern is the level of corrosion experienced during the OFE for Fortress FR-100. Unknown and potentially undetectable issues and long-term effects of both the Magnesium Chloride (MgCl2) based FR-100 product alone as well as the accelerated corrosion experienced when FR-100 co-mingles with the ammonium polyphosphate-based PhosChek LC-95, needs to be further explored. . . . The presence of corrosion can result in a significant decrease in thickness of original load bearing material that can lead to loss of structural integrity and potentially catastrophic failure."  Thus, the Report raised the possibility of corrosion issues with the Fortress retardant used alone, but focused most of its energy on the serious "accelerated corrosion" that was found to occur when even trace amounts of the two retardants co-mingle in the field.

62.     While the Report stated that no corrosion issues were found in laboratory testing of FR-100 and FR-200 (this laboratory testing consisted of fully immersing samples of stainless steel alloys in FR-100 ad FR-200 at a high temperature for 30 days), severe problems arose when the products co-mingled: "Two air tanker companies participating in the OFE experienced maintenance-related issues when FR-100 and Phos-Chek LC-95 residuals co-mingled inside the retardant tanks. The co-mingling occurs during the normal course of business as Air tankers load from different bases. Missoula ATB [Airtanker Base] utilized Fortress FR-100, but when the air tankers were sent to a different location to reload, the tanks were then loaded with Phos-Chek LC-95. The residual products left in the tanks between loads is where the co-mingling occurred. The co-mingled product was found to present maintenance challenges related to corrosion, parts replacement and aircraft cleaning."

63.    The Report (portions excerpted below) explained in great detail that the co-mingled product formed a highly corrosive, destructive, congealed substance, which the Report referred to as "precipitate," that was stringy, would not dissolve in water or rinse off, and was very damaging to aircraft:





Sample of the substance removed from the tank. This substance will be referred to as **"precipitate"** in this report.



The picture to the left shows the substance inside of the retardant tank resulting from the intermingling of Fortress FR-100 and Phos-Chek LC-95.



The sample to the left is the precipitate scraped out of a dry bay in July 2021. Company maintenance noted that the precipitate was difficult to pull apart, was "very stringy" and exhibited properties similar to fiberglass. Maintenance personnel submerged a sample in water and found that it would not dissolve. The company collected samples and sent them to the NTDP and to Conair for further analysis.

## COMPARISION OF DRY BAY DOOR ACTUATOR COMPONENTS

**NOTE:** *All of the following components are inspected annually. Therefore, the documentation presented displays the effects of the co-mingled material (precipitate)experienced during the OFE period, 2021.*

Aircraft hauling both Phos-Chek LC-95 and Fortress FR-100 have documented increased maintenance issues during the OFE. Air actuators were jamming up and requiring replacement on a regular basis, due to corrosion. In addition, a

"gummy substance" was found to adhere to flow meters rendering them inoperable. The level of corrosion discovered on many of the aircraft components had not been experienced in the past. The documentation below shows the teardown of an actuator that was inoperable (jammed). The pictures in this report are of dry bay actuator components from an air tanker that had carried both Phos-Chek LC-95 and Fortress FR-100 and one that had carried only Phos-Chek LC-95. To ensure that the issues being experienced were related to the exposure of co-mingled product, the company also removed and dis-assembled a random actuator from an aircraft that had only transported Phos-Chek LC-95.





**Maintenance report FR-100/LC-95 exposure:** The actuator shaft was frozen and required a hammer to remove. Once company Maintenance was able to unfreeze the shaft and pull it to full extension, retardant was present on the shaft.

16

 

The **actuator** from Tanker A (LC-95 only) was easy to disassemble compared to the actuators that came from Tanker B (FR-100/LC-95). As see in the pictures below, there was no corrosion on the treads of the bolts and screws. Removing the same bolts and screws from the Tanker B actuator was difficult and required a hammer to move the allen wrench.

 

**End cap guide bolts**. No corrosion on Tanker A bolts (LC-95); Heavy corrosion on threads from Tanker B (FR-100/LC-95).

 

**End cap mount screws**. No corrosion on screws from Tanker A (LC-95); Corrosion on screws from Tanker B (FR-100/LC-95).



**Tanker B (FR-100/LC-95):** The **end cap guide** (left) with shaft still attached could not be removed by hand. It was stuck in the cylinder and took several blows from a hammer to free the shaft from the guide. Heavy corrosion can be seen around the shaft and guide. The corrosion was so bad on the end cap and seal (right), that it allowed retardant inside the cylinder (right picture, below).







**Comparison of 2 cylinders from 2 different aircraft tanks:** <u>Above Left</u>: Tanker A which transported only Phos-Chek LC-95– no corrosion; <u>Above Right</u>: Tanker B which has transported both Phos-Chek LC-95 and Fortress FR-100, shows corrosion on the shaft.





**Comparison of actuator end cap guide:** <u>Above Left</u>: Tanker A which transported only Phos-Chek LC-95--the actuator end cap showing no corrosion; <u>Above Right</u>: from Air tanker B which has transported both Phos--Chek LC-95 and Fortress FR-100 --shows actuator end cap guide with heavy corrosion

 

**Comparison of the end mounting cap:** Tanker A (LC-95) – showing Phos-Chek LC-95 presence, but no corrosion. Tanker B (FR-100/LC-95)—exposed to the co-mingled products—showing corrosion

The following documentation displays corrosion evidence to tank components and issues experienced during aircraft cleaning. These are tanks exposed to the FR-100 and LC-95 co-mingled substance.



Area is 2.5' X 1.5' were the Gluvit has been saturated and is dis-bonding- Gluvit is an epoxy surface coating.



An area of approx. 1" x 1" were the Gluvit has been saturated, dis-bonded and has started to form corrosion.



Retardant that is congealing under all three vent valves



Retardant that is crystallizing in the tank system. Crystallization signifies the occurrence of corrosion.



The pictures are from an Air tanker's dry bay area. This material would not rinse off and mechanics had to crawl into the bay area and use scrapers to remove it.

 

The butterfly valve controls the rate and volume dispensed in conjunction with the tank floats and flow rate meters. It modulates to control the coverage level. The seal around the valve is filled with air. Precipitate can cause the seal to leak and the valves to operate incorrectly leading to incorrect coverage levels.

 

The flow meter sends data to the tank control computer. Precipitate restricts and stops the movement of the paddle wheel, this sends incorrect data to the computer which then, sends inaccurate information to the butterfly valves. Errors in the valve, or meter lead to faults and missed dispatches.

**Cleaning/Staining aircraft paint** – the pictures below show Phos-Chek LC-95 layered over Fortress FR-100. The vendors described this as being "difficult to clean" and resulting in a chalky substance left on the fuselage paint after being rinsed off with a hose. This chalky substance was able to be removed with a great deal of scrubbing with a brush and water. The chalky substance only seemed to be present when the FR-100 was mixed with other retardants. LC-95 requires only washing with water or very light scrubbing. On a clean plane with only FR-100, washing with water cleaned off the retardant and did not leave the chalky substance. However, some aircraft experienced permanent staining from FR-100 on some of the landing gear components. Washing with soap, water, and scrub brush would not remove the stains.

  



Aft Hopper Cross Brace and float:



Level Float Housing

The build-up of the FR-100/LC-95 residue inside of the tanks, would cause the quantity indication system (a series of 7 floats inside the tank) to stick and provide inaccurate indications on the flight deck and loading ports as well as the computer that controls the tank. The thickened substance (precipitate) also caused the flow meters to stick and cause faults which affect the ability to apply a given coverage level.





Crystallizing and congealing of the precipitate in the floats. While the system is designed to account for a few floats and flow meters to be inoperable or out of parameters, the system will indicate a *Super Fault* when too many of them are inoperable. A Super Fault means that the drop system will not function properly, and the desired coverage level will not be met. It is noted that the FR-100, alone, did not produce the precipitate---this only occurred when FR-100/LC-95 co-mingle.





Tank Walls and floor: The primary issues the Air tanker vendors experienced with the FR-100/LC-95 co-mingling is the build-up of residue inside of the tanks, and its adhering to tank components.

64.     Below these graphic photographs documenting the corrosion problems, the Report states: "A concern among the company maintenance personnel is that there are likely hidden damages that are not being detected. They are concerned that if the actuators are showing this level of corrosion after hauling only a few loads of FR-100, there are likely unseen corrosion issues to other parts inside the retardant tank or fuselage. Safety of flight becomes important if

22

systems malfunction. For example, if an air tanker loses an engine and isn't able to release a load because the drop system is disabled, the outcome could be catastrophic."

65.    In its conclusion, the Report stated that: "Fortress FR-100 is an approved product for use, however, due to the lack of data and lack of testing of the substance created when the two products intermingle, it is imperative that these two products *do not come in contact with one another*." (Emphasis in original).

66.    Finally, in the section recounting the USFS's recommendations concerning the dangerous interaction between the Fortress and Phos-Chek retardants moving forward, the Report listed: "Conduct further analysis of the precipitate to determine why is it creating a gummy material that is difficult to clean and determine viable solutions to mitigate issues[;] Conduct further analysis of the accelerated corrosion that seems to be related to the co-mingling of Fortress FR-100 and Phoschek LC-95[;] **Do not allow** Fortress FR-100 and Phos-Chek LC-95 to come in contact/co-mingle in aircraft retardant tanks[.]"  (Emphasis in original).

**Fortress and Compass Receive the Report by Email Shortly After the 2021 Fire Season**

67.    Former employee 1 ("FE-1") served as the Chief Administrative Officer of Fortress from May 2019 to May 2023, reporting directly to Fortress CEO Burnham, and then became Chief Administrative Officer at Compass Minerals from the time that Compass acquired Fortress in May of 2023 until March of 2024.  FE-1 was Fortress's first employee and personally aware of every aspect of its fire retardant business.  According to FE-1, FE-1 along with the top executives at Fortress and Compass – including Defendant Crutchfield, Defendant Standen, and Fortress CEO Burnham – received copies of the Report by email shortly after the 2021 fire season, in or before approximately February of 2022.

68.     FE-1 acknowledged that Compass knew from the USFS's testing in the summer of 2021 that the co-mingling of Phos-Chek and Fortress caused corrosion. Speaking of the co-mingling issue, the top executives including Defendant Crutchfield, Defendant Standen, Defendant Hood and Fortress CEO Burnham "were completely aware," FE-1 said.

**Aware of the Corrosion Issue Documented in the USFS Report, Fortress Obfuscates and Points to Lab Tests that Do Not Involve Co-mingling**

69.     In April of 2022, an article appeared in Fire Aviation magazine, entitled: *A new competitor encounters obstacles as they attempt to enter the fire retardant market*.

70.     The article discussed the USFS's Report documenting the severe corrosion that was found to occur when Fortress and Phos-Chek co-mingled during the 2021 OFE: "During the 200,000-gallon test of Fortress retardant in 2021 at the Missoula air tanker base a surprising issue was identified by two air tanker companies when their aircraft were loaded with Fortress retardant after carrying Perimeter retardant, or vice versa. In some cases the residuals of the previous retardant when co-mingled with the second product left a sticky substance in the tanks that was visible on interior and exterior surfaces after the tanks were emptied. They also identified increased corrosion on some aircraft components. The co-mingled product was found to present maintenance challenges related to corrosion, parts replacement, and aircraft cleaning according to a report prepared by a group of five aviation specialists who presumably all worked for the Forest Service."

71.     The Fire Aviation article also copy-and-pasted images and excerpts from the Report.

72.     The author separately interviewed representatives, including the CEOs, from both Fortress and Perimeter Solutions in connection with the article.

73.    When asked about the co-mingling issue documented in the USFS Report, a Perimeter representative made the point that, even though compatibility of retardants in the field is obviously critical if Phos-Chek and Fortress retardants are both going to be used fighting wildfires, the USFS's QPL approval process appears not to take it into account.  The Perimeter representative juxtaposed the USFS's QPL approval process with that of a different government agency, the Department of Defense's approval process for firefighting foam: "In the Department of Defense qualification process, there is a requirement that any new product being tested must be compatible with any products that are already qualified. They actually test mixtures of any new product with all of the products that are already approved. And that specification has been around for decades."

74.    The Fortress executives, however, did not acknowledge the severe corrosion that was found to occur when Fortress retardant and Phos-Chek co-mingle, although they knew about the issue and it was the main point of the article for which they were being interviewed.  Instead, when asked about the corrosion concerns, a Fortress representative responded by referring to the lab testing—*__lab testing that does not involve co-mingling__*: "They single out mag chloride and they start talking about it as if we send it up in airplanes in the raw, it's like, 'Hey, we're gonna put raw salt up there.'… Chloride would be very corrosive. The science of what we do, what we spend our money on, what Joe [McLellan PhD] has an entire team doing all day is figure out how to neutralize corrosion. That's what [Perimeter] does as well, but not as well as we do. Look at our corrosion numbers."

75. The Fortress executives even went so far as to show the author sample metal coupons[4] that had been tested in a lab:

> Dr. McLellan leads Fortress' work to mitigate the corrosion caused by the retardant, for example adding corrosion inhibitors to the product. During our meeting in a breakout room at the conference he explained a little about how that is done and the tests the Forest Service and the company conduct to detect and measure corrosion. He then went to his backpack and pulled out handfuls of small plastic bags all containing "coupons" of metal strips — 2024-T3 Aluminum to be precise — saying they ran the same exact tests the Forest Service requires for retardants to be on the QPL. He removed the coupons from the bags and carefully laid them out on the black tablecloth, each approximately an inch or so wide and about four inches long. They were labeled for the type of retardant, Fortress's FR-100 or Perimeter's LC95A-Fx. Some were tested with ready to use (RTU) retardant mixed and appropriate for loading onto an air tanker, and others for the concentrate (Conc.) that would need to be mixed with water before being used in an aircraft.

> The coupons had been tested by immersion into the retardant for various lengths of time and at different temperatures.

> Dr. McLellan held up a couple of the coupons labeled LC95A-Fx that had far more discoloration and pitting than the coupons labeled FR-100, and said, "It's far more corrosive than our product."

76. Despite its apparent effort to obfuscate and portray the corrosion concerns as unfounded attempts by a competitor to derail Fortress' progress, Fortress was aware of the adverse issues documented in the USFS Report, as Fortress and Compass had received copies of the complete Report in or before February of 2022.

**<u>Testing Continues with the Two Retardants Kept Separate At All Times, and the USFS Grants the Fortress Retardants Full Qualification to Facilitate Further Integration Testing</u>**

77. In the summer of 2022, the USFS continued its Operational Field Evaluation of Fortress retardants, dropping 200,000 gallons of FR-200 from the airtanker base near Ronan, Montana.

---

[4]   A metal coupon is a sample of metal or metalwork submitted to a customer or testing agency for approval.

78.     Because the USFS ensured that Fortress retardant and Phos-Chek did not co-mingle during this round of testing, the corrosion issue was kept at bay, and both FR-100 and FR-200 were fully qualified on the QPL in December of 2022.

79.     On December 12, 2022, Fortress issued a press release announcing that FR-100 and FR-200 had been granted fully qualified status on the QPL.  Fortress again touted its performance on the USFS's lab testing, providing a hyperlink to the lab results and stating: "Importantly, Fortress LTRs have best-in-class corrosion protection, based on USFS testing. Corrosion testing on aerospace aluminum alloys, steel, and brass consistently demonstrates that Fortress' newly approved LTRs have the lowest corrosion rates of any QPL approved products."

80.     For his part, Compass Minerals CEO and President, Defendant Crutchfield, stated: "Compass has been working closely with the Fortress since 2020 and continues to support Fortress's efforts to fully commercialize their Long Term Fire Retardants products in the USA and internationally."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading Statements
### Issued During the Class Period

81.     On February 8, 2023, Compass Minerals held its first quarter earnings call for fiscal year 2023, and was specifically asked about the comingling issue involving Fortress retardant and Phos-Chek:

> Vincent Anderson [Stifel]: And then if we're thinking about Fortress, now that we are getting a bit closer to revenues here or, well, earnings. Can you just talk about the relevance of the tankers that are used in fire suppression, what kind of influence they could have on the adoption of your product if they had concerns or consternations over change over time between your product and Perimeter's products or mixing trace amounts of one product with the other? Is there just kind of a gray area in the whole process, I was hoping you could speak to their influence?

> ***Defendant Standen***: So comingling is what you're referring to when you perhaps have an aircraft that's going from one base to another and would be using our

27

product after having used Perimeter's product. ***There are standard protocols around how to rinse the tank, how to prevent any issues. I'd first like to mention the Fortress products have passed with flying colors, any corrosion testing. So that's a non-issue. When you have some comingling, you end up with some residue in a tank. So it's simply a rinse process and a reload. So we don't view it as an issue. We think it's very, very manageable by base operations for tankers coming into competitor bases and competitor tankers coming into Fortress bases. So very manageable. And we're on the QPL and we've passed all the tests, so it should not be an issue.***

(Emphasis added).

82.    Defendant Standen's statement is materially false and misleading.  First, the statement that, when comingling occurs, ***"there are standard protocols around how to rinse the tank, how to prevent any issues,"*** and "***it's simply a rinse process and a reload***." is a lie.  The core finding of the USFS's Report from the year before, which Compass had received and was aware of, is that the precipitate that forms when Phos-Chek and Fortress retardant co-mingle could ***not*** be removed by rinsing the tank.  *See, e.g.,* ¶¶63-66 ("The pictures are from an Air tanker's dry bay area. ***This material would not rinse off and mechanics had to crawl into the bay area and use scrapers to remove it***."); ("The sample to the left is the precipitate scraped out of a dry bay in July 2021. Company maintenance noted that the precipitate was difficult to pull apart, was "very stringy" and exhibited properties similar to fiberglass. ***Maintenance personnel submerged a sample in water and found that it would not dissolve***."); (Recommendations: "Conduct further analysis of the precipitate to determine ***why is it creating a gummy material that is difficult to clean and determine viable solutions to mitigate issues***[;] ***Conduct further analysis of the accelerated corrosion that seems to be related to the co-mingling of Fortress FR-100 and Phoschek LC-95[;] Do not allow*** Fortress FR-100 and Phos-Chek LC-95 to come in contact/co-mingle in aircraft retardant tanks[.]")  In light of the USFS's detailed documentation of how difficult this precipitate was for airtanker operators to remove from the aircraft, Compass Minerals'

statement that "**_We think it's very, very manageable by base operations for tankers coming into_** **_competitor bases and competitor tankers coming into Fortress bases. So very manageable_**" is false, as the entire thrust of the USFS Report was that dealing with the co-mingled precipitate was **_not_** manageable, which is why the USFS had to mandate that the two retardants be kept separate at all times pending further integration testing. Relatedly, Compass Minerals' claim that "**_So we_** **_don't view it as an issue_**" is false and misleading because, at the very least, it was clear the **_USFS_** viewed comingling as a major issue, and the USFS is the sole customer for Fortress retardant. Moreover, it is misleading that, when asked about co-mingling specifically, Compass Minerals responded by stating that "**_Fortress products have passed with flying colors, any corrosion_** **_testing_**" and are on the QPL and therefore this is a non-issue, because Compass is referring to laboratory testing that it knows does not test co-mingling at all.

83.    In addition, it was misleading to state, in response to the question about co-mingling, that "**_we've passed all the tests_**" because, as explained below and as Compass was aware, the tests that were already done did not involve co-mingling and the USFS would be conducting another round of testing for corrosion when the two retardants are integrated, the Integrated Operational Field Evaluation, or I-OFE. While the future of Fortress retardant and its prospects for entering open competition hinged on it passing the I-OFE, Compass Minerals repeatedly omitted this critical test from its public statements, rendering its statements false and misleading throughout the Class Period.

84.    On March 9, 2023, the USFS noted in its e-procurement management system that it was planning to amend its existing contract with Fortress by issuing an additional award for the purpose of performing an Integrated Operational Field Evaluation:

> The U.S. Department of Agriculture, Forest Service (USDA FS), Procurement &
> Property Services (PPS), Incident Procurement Organization (IPO) intends to

award a sole source Indefinite-Delivery, Indefinite-Quantity contract to Fortress Fire Retardant Systems (Fortress) for a limited supply of Fortress fully qualified aerial Long-Term Fire Retardant (LTFR) products and ancillary product support to the USDA FS at various Airtanker base (ATB) locations, ***for the purpose of performing an Integrated Operation[al] Field Evaluation***. Award will be via modification to existing contract 1202SC21T4001 for Operational Field Evaluations.

85.     On April 27, 2023, three officials in the contracting and procurement division of the United States Department of Agriculture, which houses the USFS, approved the amendment to Fortress' existing contract for the purposes of performing the I-OFE. As the Contracting Officer wrote in a record dated April 27, 2023:

> Fortress's recent approval to the QPL for aerial LTFR for Wildland Fire Management and the USDA FS Specification 5100-304d (or latest version) as amended, ***has created operational concerns of co-mingling of the Fortress aerial LTFR products and existing products in the USDA FS system. Because of the known interaction issues with the aerial LTFR products in the system, it is critical to award a contract for the continued use and testing of the new aerial LTFR products until such time that operational concerns have been fully vetted and the USDA FS can safely and effectively introduce the various aerial LTFR products into the field through formal mitigation measures.***
> …
> The USDA FS intends to enter into a contract with Fortress to purchase various aerial LTFR products approved on the QPL and the necessary supporting ancillary services to deliver, mix and load the product onto the designated aircraft. The period of performance will be 90 days from date of award, with an option to extend an additional 90 days if needed. The estimated value of the contract action is approximately $24M. ***To ensure appropriate co-mingling tests are performed on Fortress aerial LTFR products in the field, only one source of supply is available to meet the requirements of the USDA FS***.
> …
> Ongoing Market Research is being conducted to determine the appropriate tests and test procedures to determine how Fortress's aerial LTFR products can be safely and effectively introduced into the USDA FS system. ***Successful integration of Fortress products will result in future competition in the aerial LTFR products market.***

86.     On May 8, 2023, Fortress and the USFS signed the amendment, contracting for an additional $24 million worth of Fortress retardant so that the USFS could conduct the I-OFE.

87.     The following day, May 9, 2023, Compass Minerals put out a press release

announcing that it was buying the remaining 55% of Fortress and leaving the Fortress management team, including its CEO, in place to run the business, and also touting the new Fortress contract. Compass Minerals' official press release stated:

> In December 2022, Fortress became the first new company in over two decades to have long-term aerial fire retardants added to the U.S. Forest Service's (USFS) Qualified Product List (QPL). ***Fortress' FR-100 Powder and FR-200 Liquid Concentrate products met and exceeded the USFS' rigorous testing criteria in such categories as environmental effects and toxicity to aquatic and mammalian species, corrosion on a variety of aircraft metals, burn retardation efficacy and other qualifiers*** (e.g., long-term storability, acceptable viscosity and pumpability) and finally the completion of a live wildfire operational field evaluation. ***In May of 2023, Fortress entered into a contract with the USFS whereby Fortress will provide up to five mobile-deployed fire retardant air tanker bases, utilizing Fortress' newly designed, state-of-the-art mixing units. These units are expected to be deployed to air bases where Fortress will supply product and attendant services for the 2023 fire season***.

88.     The emphasized statements were false and misleading.  The first emphasized statement is misleading because the statement makes it sound as though having been added to the QPL and having "***met and exceeded the USFS' rigorous testing criteria***," including the testing for "***corrosion on a variety of aircraft metals***," meant that Fortress had already passed all USFS testing.  But as Compass knew, the tests that Compass was referring to are tests done without comingling Fortress retardant and Phos-Chek, and in fact any comingling was specifically avoided because of the serious corrosion concerns that were identified when the two retardants comingled. Not only were the serious corrosion concerns that arose when Fortress and Phos-Chek co-mingled still unresolved by the testing that the USFS had done up to this point, but those corrosion concerns were going to be the subject of an additional round of testing, the USFS's I-OFE, designed specifically to test for corrosion when the two products are integrated, beginning the very next month, in June 2023.  Compass Minerals was aware that the USFS was going to conduct the I-OFE months before the USFS commenced the test in June 2023, and in fact Compass Minerals

was working closely with the USFS on the logistics necessary to make that test possible. Accordingly, this statement is materially false and misleading because it gave the impression that it was a settled fact that Fortress fire retardants had passed all of the USFS's tests, when Compass knew that was not settled and there would in fact be further testing of the Fortress retardant.

89.    The second emphasized statement, specifically that "[t]hese units are expected to be deployed to air bases where Fortress will supply product and attendant services for the 2023 fire season," is misleading because it omits to include that the units will be deployed ***as part of*** the USFS's upcoming Integrated Operational Field Evaluation to follow up on the concerns documented in the USFS Report and to test for corrosion when Fortress and Phos-Chek retardants are integrated in the field.  This statement too is materially false and misleading because it gave the impression that it was a settled fact that Fortress's fire retardants had passed all of the USFS's tests, when in fact Compass knew that was not settled and there would be further testing of Fortress retardant beginning the very next month.

90.    Moreover, Compass Minerals' May 9, 2023 press release included this comment from Fortress CEO Robert Burnham:

> Burnham commented, "Being fully integrated with Compass Minerals will represent a quantum leap forward for Fortress and empower us to scale up and compete in what has been a one-sided market. ***Achieving the recent milestone of becoming the first new company in more than two decades to have our aerial fire retardants fully approved on the Qualified Product List, followed by securing a binding supply agreement with the USFS, represents the culmination of a multi-year effort and shared vision between the Fortress and Compass Minerals teams***.["]

91.    The emphasized statement is false and misleading because it refers to the contractual amendment enabling the USFS to conduct the I-OFE as the "culmination."  But it was not the "culmination" of anything: Fortress's retardant was still required to pass the I-OFE and demonstrate it was not corrosive to aircraft when co-mingled before the USFS could give the

retardant a long-term supply agreement. Compass would have to prove that the Fortress and Phos-Chek retardants could be safely integrated in the field, successful integration being a prerequisite to future widespread adoption and open competition on the part of the USFS.  In short, the I-OFE was a hurdle standing in the way of the Fortress retardant, one that Compass concealed from investors.

92.     Also on May 9, 2023, the Company issued a press release announcing their second-quarter results. The Company announced as a recent highlight: "Acquisition of remaining 55% of Fortress North America (Fortress), a next-generation fire-retardant company, expected to be immediately accretive in fiscal 2023 with prospects for considerable upside thereafter[.]"

93.     Later in the press release, the Company released some additional detail regarding the contract extension that Fortress and the USFS had signed the day before to enable the USFS to conduct the I-OFE: "Prior to the acquisition, Fortress entered into an agreement with the U.S. Forest Service (USFS) to supply product and provide associated services in the 2023 fire season. Fortress is the first new aerial fire-retardant company in over 20 years ***to supply fully approved retardants to the USFS in its fire-fighting activities***. Fortress is expected to generate between $20 million and $25 million of revenue and operating profit and EBITDA in the low double-digit millions of dollars in fiscal 2023." While Compass referred to the Fortress retardants as "fully approved," it did not mention that the USFS was entering into the contract extension to conduct the I-OFE to test whether or not Fortress retardant could be safely integrated with the existing retardant, or that the future use of the Fortress retardant by the USFS depended on the results of this upcoming test.  This was materially misleading to investors because it overstated the possibility that the USFS would continue to contract with Compass Minerals for Fortress retardant in the future.

33

94.     The following day, on May 10, 2023, the Company held its earnings call for the

second quarter of 2023.  Defendant Crutchfield stated in prepared remarks:

> For those of you who are not familiar with Fortress, it's a next gen fire retardant
> company that utilizes our magnesium chloride and other salt production as the key
> ingredients in its formulations of aerial and ground fire retardants. The aerial fire
> retardant industry has essentially been a monopoly for over two decades. Bob
> Burnham and his team are entrepreneurs, as well as fire, aviation, chemistry, and
> government contract experts who saw an opportunity to develop a suite of products
> that were more effective and better for the environment than the incumbent
> products being used.
> …
>
> In December 2022, Fortress became the first new company in over two decades to
> have long term aerial, fire retardants added to the U.S. Forest Service, qualified
> product list, or QPL after meeting or exceeding rigorous testing across a number of
> categories and evaluations…
>
> Then early this month, Fortress reached an agreement with the U.S. Forest Service
> that will result in Fortress supporting up to five mobile deployed air bases with
> product and associated services in the upcoming 2023 fire season utilizing Fortress
> new state of the art, mobile and fixed retardant mixing units. The U.S. government
> recognizes that competition in the market is preferable to sole sourcing for essential
> products and services and accordingly, there are programs that provide on ramps
> into the retardant market where it would like to see competition occur.
>
> Under a framework used by U.S. government agencies, including the U.S. Forest
> Service to boost competition in critical sectors where government is the primary
> buyer, a substantial portion of Fortress activity will be contracted by the U.S. Forest
> Service in fiscal '23. We anticipate operating under a similar framework in 2024 as
> well, and then moving into more open competition in 2025. In the simplest terms,
> this program establishes a glide path for new competitors like Fortress, to attain
> critical mass for their products and services in the first couple of years of
> commercial operation and encourages Fortress to build additional scale.

95.     This statement is materially misleading because it makes it sound as though being

placed on the QPL meant that Fortress retardants had already passed all of the USFS's tests, and

that Fortress's contract for the 2023 fire season was an ordinary commercial contract between the

USFS and Fortress on the so-called "glide path" towards additional scale, commercial operation,

and open competition.  But the contract was part of the USFS's I-OFE; it was part of the upcoming,

follow-up test on comingling that would determine the future of the Fortress retardants.  Moreover, the statement is misleading because it references the expectation that Compass Minerals would operate "under a similar framework in 2024" before "moving into more open competition in 2025," but omits to mention that entering open competition will require mixing of Fortress retardant with Phos-Chek, which is precisely what the USFS is testing in the I-OFE.  It was misleading to fail to disclose to investors that the USFS would not likely use Phos-Chek in 2024 and 2025 if it failed the I-OFE in 2023. In other words, Pho-Chek's future hinged on the I-OFE and Defendants misleadingly concealed that fact while giving investors the false impression that no further testing was required before the USFS adopted Fortress's retardant for long-term use.

96.    Later in the earnings call, Compass was asked specially about any kind of "monitoring" "with the competitive product" that will be occurring in the upcoming fire season:

> Vincent Anderson [Stifel]: So will the acres that deploy your product this year, assuming it's required, will those receive some kind of active monitoring to continue to compare and contrast with the competitive product?
>
> **Defendant Standen**: Acres, are you talking, are you still talking about fire retardant?
>
> Vincent Anderson [Stifel]: Still Fortress. Yeah. This was studied.
>
> Speaker: I'm not sure I understand. Can you say it again? Sorry.
>
> Vincent Anderson [Stifel]: You're going to be deployed, this year in the field, officially? And will there be active monitoring of how your product performs?
>
> **Defendant Crutchfield**: _**So the product efficacy is defined, established, and that's actually what gets us on the QPL as well as the environmental benefits, etc. So there is not. This is a process where we are ramping up kind of five mobile retardant bases through the summer to various locations. We're currently working on that operational plan now with the expectation that the first base deploys in June and then ramps up through the season. And it'll be working, the bases will be in similar locations to the incumbent. And able to operate at the same time at the same places throughout the season**_.

97.    The emphasized statement is false and misleading because, ***in the context of being asked specifically about any monitoring involving the competitive product in the upcoming fire season***, Defendant Crutchfield answers by insisting that the "product efficacy" has already been established and refers to the OFE testing that occurred prior to the Fortress retardant being placed on the QPL. But the question is about monitoring in the ***upcoming fire season***, and Defendant Crutchfield omits the I-OFE entirely.  In fact, even as Defendant Crutchfield states that Compass is currently working on the "operational plan" for June (the month the I-OFE will begin), and that the plan will involve placing Fortress bases "in similar locations to the incumbent," (the operational plan for the I-OFE), Defendant Crutchfield omits that this is all part of the USFS's I-OFE which is designed to test whether the retardants can safely commingle in the field or not.  Put simply, when asked about monitoring in the upcoming fire season, Defendant Crutchfield falsely denies it and omits the I-OFE from his answer, even though the I-OFE is beginning in June, ***and Defendant Crutchfield acknowledges that he is currently working on its operational plan***.  (*See* ¶¶98-103, describing the operational plan for the I-OFE.)  By omitting the I-OFE from his response about upcoming monitoring involving Fortress and Phos-Chek, Defendant Crutchfield misled investors.

98.    On June 15, 2023, the USFS began the I-OFE.  The I-OFE's aim was to test for corrosion and other effects of integrating Fortress and Phos-Chek, following up on the serious problems that had surfaced when the two retardants co-mingled in the 2021 OFE.

99.    The I-OFE involved two airtankers carrying Fortress products, and took place in Arizona, California, Montana and Washington State over the summer of 2023.  The design of the I-OFE consisted of strategically locating Fortress mobile retardant bases alongside existing airtanker bases stocked with Phos-Chek.  According to the USFS, the testing was designed in three

phases, with the goal of isolating and studying the interaction between Fortress and various types of Phos-Chek retardant.

100.    Phase 1, which kicked off on June 15, 2023, at the Fort Huachuca Airtanker Base in Arizona, consisted of the I-OFE tankers carrying and dropping only Fortress FR-200 and reloading only at Fortress mobile retardant bases.

101.    Phase 2, which began later in the summer, involved the I-OFE tankers reloading at the closest airtanker base and involved the co-mingling of FR-200 with all varieties of Phos-Chek except Phos Chek LC-95.

102.    Finally, Phase 3 allowed for the co-mingling of Fortress FR-200 and all varieties of Phos-Chek, including Phos Chek LC-95.

103.    The I-OFE ran from June 15, 2023 through December 31, 2023, and also included scheduled winter inspections of the airtankers that had participated in the I-OFE to check for corrosion of the aircraft.

104.    Only after the I-OFE testing and complete analysis of the results would the USFS be in a position to determine the future for Fortress retardant and whether it could progress toward open competition with Phos-Chek or not.

105.    Former employee 2 ("FE-2") is the co-founder and former head of finance and Chief Operating Officer of Fortress who, after Compass' acquisition of Fortress, stayed on with Compass until October 2023.  According to FE-2, the Forest Service insisted on conducting the I-OFE in the summer of 2023 because the Forest Service had concerns that "the two products didn't mix well."

106.    According to FE-2, Compass knew about the comingling issue that was being probed in the integration testing.  FE-2 stated that, leading up to and during the integration testing

that started in June of 2023, Compass Minerals and the USFS were having weekly calls to discuss possible ways to solve this problem of corrosion caused by commingling. "We had calls with the Forest Service every week. We were always talking about solutions…. There are a lot of ways to solve it. Just don't comingle them. Never let the two products mix. Put them in different parts of the country. Just use the magnesium chloride fire retardant somewhere [instead of both] because it had a much better eco footprint. They had all kinds of options but they decided to do their I-OFE so that was their edict. We had no choice."

107.    This is corroborated by FE-1, who was also on the weekly calls with the USFS discussing the co-mingling issue, both leading up to and during the I-OFE.  FE-1 stated that the calls included Defendant Hood, Compass' Chief Supply Chain Officer and Head of Fire Retardants, and leaders from the USFS based in Boise, Idaho and Washington, D.C.  FE-1 confirmed that they would discuss how things were going with the ongoing I-OFE testing on these calls.  "It was how things were going, what testing was being done, what was being completed, what was the next step," FE-1 said.  FE-1 took notes on these calls with the USFS in which the I-OFE was discussed, and emailed the notes to Defendant Hood and others.  The working relationship between Compass and the USFS both leading up to the I-OFE, and while the I-OFE was ongoing over the summer of 2023, was "very close," FE-1 stated.

108.    FE-1 also confirmed that Compass Minerals – including Defendants Crutchfield, Crenshaw, Standen and Hood – was aware of the upcoming I-OFE several months before the I-OFE began in June of 2023.  This is because there are a lot of logistics to work through before beginning this type of testing procedure.  The "ramp-up" to it started by mid-April, FE-1 recalled.

109.    In addition to the calls between the USFS and Compass, FE-1 also stated that there were internal meetings, held either every week or every other week, specifically on the co-mingling

issue and the ongoing I-OFE. Defendants Crutchfield, Crenshaw and Standen attended these meetings, and were aware of, and had conversations about, the co-mingling issue throughout the summer of 2023. FE-1 knows this because FE-1 personally set up the meetings that focused on the co-mingling issue and the I-OFE, and was personally in charge of calendaring these meetings and ensuring that Defendants Crutchfield, Crenshaw and Standen attended. Defendants Crutchfield, Crenshaw and Standen "were very well aware of what was going on," FE-1 said.

110.    While Compass Minerals knew that the USFS was conducting integration testing to test for corrosion when Fortress retardant and Phos-Chek co-mingle – and was being kept abreast of developments on a weekly basis – this is not what Compass Minerals told investors. Rather, Compass Minerals continued to falsely imply that FR-100 and FR-200 had already passed all of the USFS's tests, and touted its ongoing activities in Arizona, California and elsewhere simply as landmark achievements for the company, omitting the critical caveat that these activities were taking place as part of the USFS's integration testing program to test the USFS's concerns relating to the serious corrosion found to occur when Fortress retardant co-mingles with Phos-Chek.

111.    On August 9, 2023, Compass Minerals held its earnings call for the third quarter of the fiscal year. Defendant Crutchfield stated in prepared remarks:

> Changing gears to our other primary growth opportunity, I'm pleased to be able to share some exciting updates with regard to Fortress. As we announced last quarter, we acquired the outstanding 55% in Fortress in May of this year, bringing our ownership stake to 100%. ***This occurred shortly after they signed a supply agreement with the U.S. Forest Service. Using their advanced mobile units, Fortress is supporting up to five air tanker bases with product and associated services this 2023 fire season. In June, Fortress began dropping product at an Arizona Air Base, marking Fortress' first commercial sales since being added to the Forest Service qualified product list in late '22.*** As expected, the feedback we've received regarding both the performance of the products and the execution by the Fortress team has been extremely positive.

Subject to quarter end, we were working on three additional assigned bases. One in Montana, one in Washington State, and the U.S. Forest Service base in California. ***In fact, the U.S. Forest Service recently deployed an aircraft out of a base in San Bernardino, California, to drop Fortress products on the Rabbit fire in Riverside County marking our first drops in California***. Most recently, Fortress has been active in combating fires in the Mojave Desert.

***The team at Fortress continues to work on its next generation of products. FR-105 will eventually replace FR-100 as the company's primary powder retardant offering. We expect that it will deliver improvements with regard to visibility, environmental impact. FR-105 is undergoing the continuation of operational field evaluation that began in '22 and today has dropped approximately 65% of the required 200,000 gallons. We're well on our way to completing the required OFE volume this summer. Looking ahead, we're currently in discussions with U.S. Forest Service regarding the contract for 2024 and beyond.***

112. The emphasized statements were false or misleading. While the statements portray Fortress's recent drops, including in Arizona and California, simply as achievements for the company, they omit the important fact that these activities were taking place as part of the USFS's integration testing program designed to test for corrosion when Fortress retardant and Phos-Chek co-mingle. The emphasized statements give investors the false impression that since Fortress's retardant was fully approved by the USFS, no further testing was required prior to the USFS's widespread adoption of Fortress's retardant. The emphasized statements are especially misleading because they omit all mention of the I-OFE and the USFS's continuing concerns related to corrosion and comingling, even at a time when Compass Minerals and the USFS were having weekly calls to discuss what FE-1 and FE-2 both acknowledged was a comingling problem, and, as Defendant Crutchfield acknowledged, Compass Minerals was working closely with the USFS on the operational plan for the I-OFE.

113. Relatedly, Defendant Crutchfield's characterization of the Company's June drops in Arizona as "commercial sales" is misleading, as the "supply agreement" he is referring to is the contractual amendment that the USFS entered into with Fortress explicitly "***for the purpose of***

*performing an Integrated Operation[al] Field Evaluation*." *See* ¶84.  By omitting the critical caveat that the USFS was entering into that contract explicitly "*for the continued use and testing of the new aerial LTFR products until such time that operational concerns have been fully vetted*" in the I-OFE, Defendant Crutchfield misled investors.  *See* ¶85.

114.    In addition, Defendant Crutchfield's statement is misleading because, while it discusses the ongoing OFE for Fortress's *next generation* FR-105 retardant, it treats FR-100 and FR-200 as though they have already passed all USFS tests, omitting any mention of the I-OFE that is well underway, and as part of which Compass is holding weekly calls with the USFS to try to deal with the comingling problem.

115.    The final emphasized statement, "*we're currently in discussions with U.S. Forest Service regarding the contract for 2024 and beyond*," is misleading because it omits that Compass Minerals is also in weekly discussions with the USFS about the comingling problem and the progress of the ongoing I-OFE, the outcome of which will determine whether there will be a contract for 2024 and beyond.  By concealing the ongoing I-OFE and the possibility that the testing would uncover the same corrosion concerns found in the 2021 OFE, the statement overstated the likelihood that the USFS would enter into a contract for Fortress retardants for 2024 and beyond.  This was materially misleading to investors.

116.    Later in the earnings call, Defendant Crutchfield was asked what needs to happen for Compass to really scale up the Fortress business, given the major existing competitor:

> Greg Lewis [BTIG]: Okay. That's great to hear. And then just, as I think about Fortress, it seems like this is just getting, just continuing to be a nice driver for the company. And realizing there's a major existing competitor. I guess the question is, what needs to happen for the company to really scale up this business? And I know as we were talking the last couple months, is there a way to accelerate that scaling up to kind of to take advantage of just really the demand for that?

> **Defendant Crutchfield:** Yeah, we're well on our way in doing that. We are

engaging with the U.S. Forest Service for a multi-year agreement 2024 and beyond. Those discussions will really get into details in this month and in September. So I think we're going to have a lot more visibility on what the next few years look like within the next 60 to 90 days. So there's nothing that we can do beyond make, kind of, nailing that arrangement as we go into '24 and '25.

117.    Defendant Crutchfield's statement is false and misleading because, in the context of being asked what needs to happen for the company to really scale up the Fortress business, he responds by explaining that Compass is engaging with the Forest Service and there is nothing they can do beyond "nailing that arrangement as [they] go into '24 and '25," however, Defendant Crutchfield misleadingly omitted that Compass's ability to scale up the Fortress business depends on the results of the ongoing I-OFE.  By omitting mention of the I-OFE – and the possibility that the Fortress retardant would fail the I-OFE and not be able to scale up the Fortress business – Defendant Crutchfield misled investors.

118.    Compass made further misstatements in its Fiscal 2023 Third-Quarter Business Update Presentation, dated August 8, 2023.  Slide 10 of the Presentation states in full:



## Fortress Update



- Acquired remaining 55% not previously owned of Fortress in May 2023, advancing strategy to accelerate growth and reduce weather dependency by expanding into faster-growing, adjacent markets

- In May 2023, Fortress entered into an agreement with the U.S. Forest Service (USFS) to provide products and services through up to five mobile retardant bases during the 2023 fire season

- Achieved commercial milestone in June 2023 with first commercial drops of product in Arizona

- Subsequent to quarter-end, Fortress had four mobile bases deployed in Arizona, California, Montana and Washington

- USFS recently deployed aircraft out of San Bernardino, California to drop Fortress product on the Rabbit fire in Riverside County



Above: Fortress FR-200 aerial retardant being deployed at the Rabbit fire in Riverside County, California.

10

119.     This slide is misleading because, while the slide portrays Fortress's recent activity in Arizona, California and elsewhere as achievements for the company, it omits the important fact that these activities were taking place as part of the USFS's integration testing program designed to test for corrosion when Fortress retardant and Phos-Chek co-mingle in the field.  Again, the "commercial milestone" and "commercial drops" being touted here are drops pursuant to the contractual amendment that the USFS entered into with Fortress explicitly to acquire product to drop in the I-OFE.  *See* ¶84.  By omitting the critical caveat that the USFS had entered into this contract explicitly "***for the continued use and testing of the new aerial LTFR products until such time that operational concerns have been fully vetted***" in the I-OFE, the statement misleads investors and overstates the possibility that there will be additional contracts in 2024 and beyond. *See* ¶85.

120.     The slide's bottom bullet point, "***USFS recently deployed aircraft out of San***

43

*Bernardino, California to drop Fortress product on the Rabbit fire in Riverside County,"* the related picture and its caption highlight what makes this slide misleading to investors.  The photo in the slide is captioned: "***Above: Fortress FR-200 aerial retardant being deployed at the Rabbit fire in Riverside County, California***."

121.    When one looks closely at the plane in the photo, one can see that the plane is Erickson Aero Tanker 106:



122.    As later confirmed by the director of production and certification of Erickson Aero Tanker, Erickson Aero Tanker 106 was one of the two airtankers that participated in the I-OFE during the summer of 2023, sustained significant corrosion damage, and was later grounded for the entire 2024 fire season because of the corrosion sustained during the I-OFE.

123.    Moreover, the other airtanker involved in the I-OFE was Neptune Aviation's Tanker 02, as later revealed by Neptune Aviation's vice-president of operations.  Significant corrosion on Tanker 02 was found after flying back from San Bernardino, California, where it had also been carrying and dropping Fortress retardant as part of the I-OFE.

124.    Fortress' drops from Erickson Auto Tanker 106 on the Rabbit fire (which burned in July of 2023), and the supply agreement pursuant to which those drops were made, were all part

44

of the USFS's I-OFE testing program studying whether Fortress retardant and Phos-Check could be safely integrated in the field or not. But that is not what Compass Minerals told investors. Rather, Compass falsely conveyed that the Fortress retardant FR-100 and FR-200 had already passed all the tests and that its recent drops from Erickson Aero Tanker 106 in California and elsewhere were part of a normal commercial contract and landmark achievements for the Company. Compass's touting these supposed achievements – while omitting they were really part of the USFS's I-OFE testing – materially misled investors.[5]

125.    Compass made a substantially similar misstatement in its third quarter earnings report, dated August 8, 2023, which included the following under the heading "Fortress North America Update:"

> As previously disclosed, Compass Minerals completed the acquisition of the remaining 55% of Fortress that it did not own on May 5, 2023. ***Prior to the***

---

[5]    Compass used the same slide in its slideshow at C.L. King's 21st Annual Best Ideas Conference, on September 18, 2023. The slide was false and misleading on September 18, 2023 for the same reasons it was false and misleading on August 8, 2023. Compass also posted the same photo of Erickson Tanker 106 dropping FR-200 several times on its social media accounts throughout the Class Period, while omitting that what the photograph captured was I-OFE testing. For instance, Compass posted the photo on X on August 22, 2023, beneath the text "Fortress is the only alternative to fertilizer-based fire retardants currently on the market and the first entrant to the industry in over 20 years to be added to the U.S. Forest Service's Qualified Product List," which gave the impression that the Fortress retardant had passed all USFS testing and omitted that what the photograph actually captures is the next round of USFS testing, the I-OFE. In addition, Fortress posted photos of both I-OFE airtankers, Neptune Tanker 02 and Erickson Tanker 106, on its social media accounts during the Class Period, alongside captions touting that the FR-200 retardant these tankers were dropping was fully qualified and on the USFS's QPL, also omitting that the photos captured I-OFE testing. *See* October 2, 2023 Fortress post on Facebook and X (showing Neptune Tanker 02 dropping FR-200 with caption, "The latest trends in tanker aircraft are revolutionizing wildfire containment. #Neptune02 tankers have been dropping the #FortressFR-200, a fully qualified retardant, on the USFS qualified product list"); November 3, 2023 post on Facebook (showing Erickson Tanker 106 dropping Fortress FR-200 with caption, "FR-200 in action to help fight the Highland Fire in Aguangaca, CA. Fortress' FR-200 is fully approved on the USFS-qualified product list"); *see also* February 2, 2024 post on Facebook and X (showing Erickson Tanker 106 on runway in mobile base, with caption, "When you see our hexagon logo at one of our mobile retardant bases, you know you're getting a fire retardant that's on the U.S. Forest Service Qualified Products List.").

*__acquisition, Fortress entered into an agreement with the U.S. Forest Service (USFS) to supply product and provide associated services in the 2023 fire season for up to five mobile bases. In June it achieved a commercial milestone by dropping its first product supporting fire suppression efforts in Arizona. Subsequent to quarter end, the USFS deployed an aircraft out of a base in San Bernardino, California, to drop Fortress products on the Rabbit fire in Riverside County.__*

126.     Like the misstatements in its third-quarter earnings call and investor presentation, this statement is misleading because, in announcing that Fortress has contracted with the USFS to supply retardant for five mobile bases in the 2023 fire season, it omits that this is part of the USFS's ongoing I-OFE testing.  In fact, the May contract was entered into specifically so that the USFS could obtain retardant to drop as part of the I-OFE.  *See* ¶84.  The omission of this fact makes the affirmative statement misleading.  In addition, by touting Fortress's June drops in Arizona and its drops out of the San Bernardino, California airtanker base on the Rabbit fire in Riverside, while omitting that these activities are part of the I-OFE designed to test for corrosion and other problems when Fortress retardant is integrated with Phos-Chek, the statement misleadingly conceals a substantial risk that the Fortress retardant would fail the I-OFE and, as a result, the USFS would not enter into a contract for Fortress retardants for 2024 and beyond.

127.     On November 17, 2023, Compass Minerals held its fourth quarter earnings call. Defendant Crutchfield stated in prepared remarks:

> Fiscal '23 was also an exciting year for our emerging Fire Retardant business. After a rigorous multi-year process, two core Fortress products were added to the US Forest Service qualified product list in December of 2022. *__This opened the door to allow governmental agencies to purchase Fortress' fire retardant products, which were the first new products to enter the market in nearly two decades. Fortress was awarded its first contract in May and we consolidated our ownership of the company shortly thereafter. In June '23, we achieved another milestone when we dropped our first commercial product. The feedback that we've received on the efficacy of the products and the operational performance of the team has been excellent. We're currently in the process of finalizing our contract with US Forest Service for 2024__*. We're off to a good start with Fortress and we're excited about the high-margin counter-seasonal growth potential that this business can

46

provide for the Company.

128.    The emphasized statements were false and misleading.  The statement again touts the company's June drops as a commercial milestone, while omitting the fact that these drops are happening within the ongoing I-OFE, designed to test what happens when Fortress retardant is integrated with Phos-Chek.  Relatedly, it is misleading to state that the feedback received on the products has been excellent and that the company is "***currently*** in the process of ***finalizing*** our contract with U.S. Forest Service for 2024," because the I-OFE is still ongoing and, in fact, included scheduled winter inspections of the airtankers used in the testing.  Accordingly, Compass was not going to learn the results of the I-OFE until winter or later, yet this statement – touting the excellent feedback and stating that the company is "***currently*** in the process of ***finalizing*** our contract with U.S. Forest Service for 2024" – gave the false impression that there are no known impediments or preconditions to finalizing the contract.  The statement misleadingly conceals the substantial risk that the ongoing I-OFE would reveal the same corrosion concerns that the 2021 OFE revealed.  Accordingly, the statement was materially false and misleading because it understated the risk that the USFS would not enter into a contact for Fortress retardants for 2024 and beyond, considering that the integration testing had not yet concluded, and Compass Minerals knew there was a "comingling problem," a serious problem that it was discussing with the USFS on a weekly basis.

129.    Compass made similar misstatements in its Fiscal 2023 Fourth-Quarter and Full-Year Business Update Presentation, dated November 16, 2023.  Slide 10 of the Presentation states in full:



## Fortress Update

### Fiscal 2023 Recap

- Completed acquisition of the remaining 55% of Fortress, bringing the company to full ownership in May 2023
- In May 2023, Fortress entered into an agreement with the U.S. Forest Service (USFS) to provide products and services at up to five mobile retardant bases during 2023 fire season; first commercial sales achieved in June 2023 with first commercial drops of product in Arizona
- Mild 2023 wildfire season resulted in ~$12 million of adjusted EBITDA under calendar year 2023 USFS take-or-pay contract slipping from 4Q23 to 1Q24; total value of contract unchanged

### Fiscal 2024 Outlook

- Compass Minerals engaging with USFS regarding calendar 2024 contract; expected to finalize in December 2023 or January 2024



Above: Fortress FR-200 aerial retardant being deployed at the Rabbit fire in Riverside County, California.

10

130.    This slide is false and misleading.  First, Compass again falsely treats its drops in Arizona in June 2023 and its drops from Erickson Aero Tanker 106 in Riverside as commercial achievements for the company, while omitting the fact that these drops are happening within the ongoing I-OFE, designed to test what happens when Fortress retardant is integrated with Phos-Chek.  Omitting mention of the I-OFE – and the resulting possibility that the I-OFE would find signs of corrosion it was designed to detect – misleadingly concealed a substantial risk that the USFS would not enter into a contract for Fortress retardants for 2024.

131.    Relatedly, the bottom bullet point – "Compass Minerals engaging with USFS regarding calendar 2024 contract; expected to finalize in December 2023 or January 2024" is false and misleading because, by omitting any mention of the I-OFE, that the I-OFE is ongoing with airtanker inspections scheduled for the winter, that Compass Minerals is holding weekly calls with the USFS to resolve the serious comingling problem, and that successful completion of the I-OFE

is a prerequisite to continued contracts with the USFS and ultimately entering open competition, the statement misleadingly concealed a substantial risk that the USFS would not enter into a contract for Fortress retardants for 2024. This bottom bullet point, which appears right next to the I-OFE photograph (without disclosing as much) and touts Compass Minerals' ongoing engagement with USFS on the 2024 contract, highlights what makes the slide so misleading: By concealing that the photograph is actually from the I-OFE (and indeed omitting the existence of the I-OFE entirely), the slide conceals the possibility that the Fortress retardant would fail the I-OFE and not secure a contract for 2024 and beyond.

132.    Compass made a substantially similar misstatement in its fourth-quarter earnings report, dated November 16, 2023, which included the following under the heading "Fire Retardant Business Update:

> During the year, Compass Minerals completed the acquisition of the remaining 55% of Fortress, bringing the company to full ownership. ***Prior to the acquisition, Fortress entered into its initial agreement with the U.S. Forest Service (USFS) to supply product and provide associated services in the 2023 fire season for up to five mobile bases and in June it achieved its first commercial sales. Feedback received regarding the performance of Fortress products and the operational execution by company personnel was positive.***

133.    Like the misstatements in its fourth-quarter earnings call and investor presentation, this statement is misleading because by touting Fortress's 2023 contract with the USFS, the recent milestones reached in June and the positive feedback received – without disclosing the I-OFE and the resulting possibility that the I-OFE would find signs of corrosion that it was designed to detect – the statement misleadingly concealed a substantial risk that the USFS would not enter into a contract for Fortress retardants for 2024 and beyond.

134.    On January 15, 2024, the Company agreed with Defendant Crutchfield that, effective January 17, 2024, Crutchfield would cease to serve as the Company's President, CEO

and board member.

135.    Effective January 16, 2024, Defendant Standen ceased to serve as the Company's

Chief Commercial Officer.

136.    On February 8, 2024, Compass Minerals held its earnings call for the first quarter

of the 2024 fiscal year.  While Compass Minerals had told investors in November that it expected

to have a finalized contract with the USFS for the 2024 fire season in December 2023 or January

2024, Compass still did not have a contract.   Defendant Crenshaw explained away the delay by

stating that:

> the U.S. Forest Service changed the solicitation contract requirements for the
> calendar '24 contract and this has resulted in delays in the negotiation and
> finalization of a contract for the '24 fire season, which starts in the April, May
> timeframe. We continue to expect to have a finalized contract prior to deployment
> for the upcoming fire season.

137.    Later in the earnings call, when asked about the apparent delay in the contracting

process, Compass provided this update on Compass's engagement with the USFS:

> Q: And then lastly, you talked about some changes in requirements from the US Forest
> Service affecting your Fortress business. But I couldn't tell whether you thought that it
> actually delayed anything. What you said is you expected to have your paperwork in
> order before the 2024 fire season. So if that's true, does the delay really make no
> difference?
>
> ***Defendant Jenny Hood***: So the delay, just to give a little bit more color on that. The
> original solicitation from the US Forest Service was issued in late September. It took
> them until mid December to issue a final revised solicitation, and the solicitation deadline
> was then January 10th. So it absolutely pushed back the contracting process, in total.
> ***However, we are pleased since January 10th when we were able to start the
> negotiations, we're pleased with the progress and the engagement that we're seeing
> from US Forest Service. Keep in mind that previously the Forest Service was dealing
> with one sole source supplier for over two decades. So thinking about how to integrate
> another supplier, both from a contractual standpoint as well as in the field has been
> quite challenging for them, but however, we are supporting them in those efforts. And
> again, we're pleased with the engagement that we've received since the submission
> deadline.***

138.    Defendant Hood's emphasized statement is false and misleading.  In the context of

discussing the difficulties the USFS has been experiencing in integrating retardant from a new supplier (Compass) with the existing supplier (Perimeter Solutions), Defendant Hood's statement makes it sound as though these difficulties are simply due to the fact "***that previously the Forest Service was dealing with one sole source supplier for over two decades***." But that is not the real reason integrating a new supplier "***in the field has been quite challenging for them***." Rather, integrating a new supplier in the field had been challenging because, pending the results of the I-OFE, the two retardants cannot comingle because of serious corrosion concerns, which Compass had repeatedly denied and downplayed, but that Compass knew from its weekly calls with the USFS on the "co-mingling problem," remained a major concern for the USFS and was the subject of its integration testing program launched specifically to look for corrosion when the two retardants mix. By omitting the "co-mingling problem" and the I-OFE from its discussion of the USFS's efforts to integrate a new supplier in the field – and instead simply stating that "***we are supporting them in those efforts***" and "***we're pleased with the engagement that we've received since the submission deadline***" – the statement misleadingly concealed that the USFS was continuing to probe the documented corrosion problems involving the integration of Fortress and Phos-Chek retardant, and misleadingly overstated the commercial viability of Fortress retardant and the likelihood of a USFS contact for 2024 and beyond.

139.    On February 29, 2024, Defendant Standen sold 34,342 shares of stock he owned in the Company, worth approximately $779,000. Defendant Standen's stock sale liquidated all of the shares he owned in the Company, other than 3,186 shares he held indirectly through the Company's 401(k) Plan.

## **THE TRUTH EMERGES**

140.    On March 25, 2024, before the market opened, Compass issued a press release

revealing that the I-OFE's scheduled winter airtanker inspections had found significant corrosion in both of the airtankers that had carried Fortress retardant as part of the I-OFE and, as result, the USFS would not be entering into a contract for Fortress retardant.  The press release stated in relevant part:

> Compass Minerals (NYSE: CMP), a leading global provider of essential minerals, today announced that the U.S. Forest Service (USFS) has informed the company *that it will not be entering into a contract for the use of magnesium chloride-based aerial fire retardants for the 2024 fire season.*
>
> *During scheduled winter airtanker inspections as part of the USFS' Integrated Operational Field Evaluation (I-OFE), it was discovered that certain airtankers that had flown Fortress North America's (Fortress') proprietary, magnesium chloride-based aerial fire retardants revealed significant signs of corrosion in areas where build-up of the retardant had occurred. The findings from this more extensive inspection raised aircraft safety concerns*, prompting the USFS' decision to inform Compass Minerals on March 22, 2024, that it would be "unable to define the scope and associated terms and conditions of a new contract" with the company until the National Transportation Safety Board (NTSB) and National Institute of Standards and Technology (NIST) conducted a coordinated, independent assessment of the findings.
>
> "While we are disappointed with the findings of the initial inspection, we share the USFS' prioritization of safety above all other factors," said Edward C. Dowling Jr., president and CEO. "As we work collaboratively with the USFS, NTSB and NIST on the more detailed assessment to be conducted, we have to assume based on this new information that Fortress' proprietary, magnesium chloride-based aerial fire-retardant formulation will not be utilized for the foreseeable future in the fight against wildfires."
>
> (Emphasis added).

141.    On this news, the price of Compass Minerals stock fell $3.00 per share, or 17.09%, to close at $14.55 on March 25, 2024.  The next day, Compass Minerals stock fell a further $0.86 per share, or 5.91%, to close at $13.69.

142.    Analysts were shocked, given how Compass had omitted the ongoing I-OFE from its public statements and repeatedly assured investors that any concern with corrosion or the co-mingling of Fortress and Phos-Chek retardants was a "non-issue."  In a report published on March

25, 2024, a BMO Capital Markets analyst report stated: "CMP will not be signing a supply agreement for the 2024 fire season with the USFS after its Fortress branded (magnesium chloride) aerial fire retardant caused corrosion in airtankers."   The analyst opined: "***The Fortress development is shocking, in our view[.]***"

143.    On April 18, 2024, an article appeared in the *Missoulian*, entitled: "Corrosion from new fire retardant grounds two airtankers."   The article reported on the identity of the two airtankers that participated in the I-OFE in the summer of 2023 and sustained significant corrosion:

> Nic Lynn, vice-president of operations at Missoula-based Neptune Aviation, confirmed that the company's Tanker 02 used the magnesium chloride retardant from Compass Minerals last year. The plane is one of Neptune's nine active BAe-146 quad-jet tankers. It has not flown since it returned to Missoula from San Bernardino, California, on Dec. 19 last year. The company's other aircraft were not affected.
> …
> Kevin McLaughlin, director of production and certification at Oregon-based Erickson Aero Tanker, confirmed that the company's Tanker 106 used Compass Minerals' retardant last year and would be grounded for the 2024 fire season. It last flew Dec. 14 last year when it returned to Madras, Oregon, from Porterville, California. The six other aircraft in Erickson's fleet — all MD-87 jets like Tanker 106 — were unaffected.

144.    Compass Minerals had used a photograph of Erickson Aero Tanker 106 dropping Fortress retardant on the Rabbit fire in Riverside, California – a fire that burned in July, 2023, in the middle of the I-OFE – in multiple investor presentations during the Class Period, without disclosing the existence of, and reasons for, the I-OFE.  *See* ¶¶118, 121, 129.

145.    Further corroborating the information in the *Missoulian* report, the USFS Contracting Officer for Air Tankers confirmed that Erickson Aero Tanker 106 and Neptune Tanker 02 were the only two tankers that carried Fortress retardant, and that they both sustained corrosion in the I-OFE testing.  Moreover, Erickson Tanker 106 was, to his knowledge, a brand new air tanker that had never carried retardant prior to the I-OFE.  The Contracting Officer added that both

air tanker vendors were in the process of submitting claims related to the necessary repairs, and that he has never seen vendors make corrosion-related claims in the thirteen or so years that he has been in charge of the air tanker program for the United States Fire Service.

146.    On May 7, 2024, in the Company's Fiscal 2024 Second-Quarter Results Press Release, the Company stated: "As previously reported, in March of 2024 Compass Minerals was informed of issues impacting the utilization of magnesium chloride-based fire retardants in aerial firefighting. As a result of the uncertainty surrounding the future use of these magnesium chloride-based products, the company recognized a loss on impairment in the quarter of $55.6 million related to write downs of goodwill and intangible assets."

## ADDITIONAL SCIENTER AND MOTIVE ALLEGATIONS

147.    Plaintiffs' investigation uncovered additional information probative of the scienter and motive of Compass Minerals for making the false and misleading statements during the Class Period.

148.    According to FE-1, Fortress' former Chief Administrative Officer from May 2019 to May 2023 who held that same position at Compass Minerals from the time that Compass acquired Fortress in May of 2023 until March of 2024, the top leadership at Compass – including Defendants Crutchfield, Standen and Hood – all knew about the co-mingling issue, and had known that the co-mingling of Phos-Chek and Fortress caused corrosion since they had received the USFS Report in early 2022.  "They were completely aware," FE-1 said.  Not only had these Defendants received the complete USFS Report in early 2022, but they were attending meetings on the co-mingling problem and the I-OFE throughout the summer of 2023, according to FE-1's personal knowledge.

149.    But according to FE-1, Compass believed that the corrosion was only an issue when Fortress retardant co-mingled with Phos-Chek LC-95 specifically, not with other varieties of Phos-

Chek.

150.     Phos-Chek LC-95 has been the form of Phos-Chek widely used for decades, however, Perimeter Solutions has been claiming to develop "next generation" varieties of Phos-Chek with altered chemistries that are purported to be more effective and have an improved environmental and toxicity profile.

151.     For instance, Perimeter Solutions announced that it was launching its next generation variety Phos-Chek LCE20-Fx in a press release from November of 2020.  However, according to Eddie Goldberg, Vice Chairman of Perimeter Solutions, the new product was still in the process of being launched as of an interview conducted with Aerial Fire magazine in July of 2023.  *See*  https://aerialfiremag.com/2023/07/03/sixty-years-of-phos-chek/ ("You know, we're always looking forward in our research and development to see what improvements can be made to our products, and what new chemistries might be out there. We're currently launching our latest product, PHOS-CHEK LCE20-FX, a next-generation liquid concentrate. It'll eventually replace our LC95A product that has been a global industry standard for the last almost 20 years.").

152.     According to FE-1, someone at the Forest Service mentioned to Compass that the Forest Service was not planning to order more Phos-Chek LC-95.  As a result, Compass believed that Phos-Chek LC-95 was going to be phased out faster than has been the case, and this would have solved the co-mingling problem.  "So what was supposed to happen was the Forest Service was going to phase out LC95 and then all of the comingling issues would be resolved because that was the only product there was an issue with," FE-1 said.

153.     That explains why Compass believed, wrongly, that it could get away with its fake-it-till-you-make it attempt to cover up the comingling problem and the existence of, and reasons for, the I-OFE: If the corrosion was limited to Fortress retardant co-mingling with Phos Chek LC-

95, which was being phased out anyway, then perhaps it would not show up in the I-OFE testing results.

154.    However, Phos-Chek LC-95 has apparently still not been phased out, and Phase 3 of the I-OFE specifically set out to test the interaction between FR-200 and Phos-Chek LC-95. *See* ¶102.

155.    Even after the USFS had decided to test the integration of Fortress retardant with Phos-Chek LC-95, though, Compass continued to conceal the co-mingling problem from investors, issuing statements that gave the false impression that co-mingling was a non-issue; that FR-100 and FR-200 had already passed all the USFS testing and that no further testing was necessary; and that therefore misleadingly overstated the likelihood that the Fortress retardant would win a contract for 2024 and beyond, right up until the results of the I-OFE's scheduled winter airtanker inspections were revealed on March 25, 2024.

## CLASS ACTION ALLEGATIONS

156.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the common stock of Compass Minerals during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

157.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Compass Minerals' securities were actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to

Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class.

158.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

159.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

160.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and prospects of Compass Minerals;

(c)   whether the Individual Defendants caused Compass Minerals to issue false and misleading statements during the Class Period;

(d)   whether Defendants acted knowingly or recklessly in issuing false and misleading statements; and

(e)   to what extent the members of the Class have sustained damages and the proper measure of damages.

161.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE

162.    At all relevant times, the market for Compass Minerals common stock was an efficient market for the following reasons, among others:

- the Company's securities met the requirements for listing, and were listed and actively traded on the New York Stock Exchange, an efficient market;

- During the class period, on average, hundreds of thousands of shares of Compass Minerals stock were traded on a weekly basis, demonstrating a very active and broad market for Compass Minerals stock and permitting a *very strong* presumption of an efficient market;

- As a regulated issuer, Compass Minerals filed periodic public reports with the SEC and was covered by multiple analysts;

- Compass Minerals regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Numerous market makers made a market in Compass Minerals stock;

- Wall Street analysts at major brokerage firms issued reports on Compass Minerals on a regular basis during the Class Period;

- Unexpected material news about Compass Minerals was rapidly reflected and incorporated into the Company's stock price during the Class Period.

74. Based on the foregoing, the market for Compass Minerals common stock promptly digested current information regarding Compass Minerals from all publicly available sources and reflected such information in Compass Minerals' stock price. Under these circumstances, all purchasers of Compass Minerals common stock during the Class Period suffered similar injury through their purchase of Compass Minerals common stock at artificially inflated prices, and a presumption of reliance applies.

163. Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon the Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other Class members would not have purchased Compass Minerals common stock at artificially inflated prices if the Defendants had disclosed all material information as required. Thus, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972).

## THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

164. The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and materially misleading statements alleged herein.

165. None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions relating to Compass Minerals' business at the time such statement was made.

166.    To the extent that any of the false and materially misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

167.    To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, the Defendants are liable for any such statement because at the time such statement was made, the speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Compass Minerals who actually knew that such statement was false when made.

168.    Moreover, to the extent any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

169.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170.    This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

171.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

172.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

173.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company and its business, participated in the fraudulent scheme alleged herein.

174.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class,

or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiffs and the Class.

175.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

176.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

177.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

178.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

179.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

180.    By virtue of their high-level positions, agency, ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violator, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  In particular, each Individual Defendant had the power to control or influence the particular transactions and statements giving rise to the securities violations as alleged herein, and exercised the same.

181.    As set forth above, Compass Minerals violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

182.    Because of their positions of control and authority as senior executives, the Individual Defendants were able to, and did, control the contents of the various statements, reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's business.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore had the power to control or influence the particular events and actions giving rise to the securities violations alleged herein.

183.    The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Compass Minerals securities.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

184.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 10, 2025                    **THE ROSEN LAW FIRM, P.A.**

/s/ Brent J. LaPointe
Brent J. LaPointe, Esq., D. Kan # 78539
Phillip Kim (admitted *pro hac vice*)
Michael Cohen (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: blapointe@rosenlegal.com
Email: philkim@rosenlegal.com
Email: mcohen@rosenlegal.com

*Lead Counsel for Plaintiffs*